## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Sheryl Russell,**
**Plaintiff Below, Petitioner**

**vs.)  No. 20-0681** (Jefferson County CC-19-2017-C-125)

**Bayview Loan Servicing, LLC,**
**Defendant Below, Respondent**

## MEMORANDUM DECISION

Petitioner Sheryl Russell, by counsel Christopher P. Stroech, appeals the Circuit Court of Jefferson County's July 30, 2020, order granting respondent's motion to enforce the parties' settlement agreement, which resolved petitioner's claim against respondent for breach of contract arising from respondent's servicing of her home mortgage loan. Respondent Bayview Loan Servicing, LLC, by counsel Jason E. Manning and David M. Asbury, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner sued respondent for breach of contract and violations of the West Virginia Consumer Credit and Protection Act ("CCPA"), stemming from respondent's servicing of petitioner's home mortgage loan. The circuit court granted respondent summary judgment on petitioner's CCPA claims, leaving only her breach of contract claim for resolution.

Thereafter, the parties began negotiating a settlement of petitioner's remaining claim, and on July 25, 2019, counsel for respondent e-mailed then-counsel for petitioner, Michael Nissim-Sabat, a settlement offer. As set forth in the e-mail, the terms of the offer were that

- [Petitioner] will have until <u>December 1, 2019</u> to fully pay off the loan (pay off amount to be determined later);
  - Payoff amount will be the amount as of December 1, 2019 (payoff as of July 4, 2019, was $285,573.11, and the amount to be determined later will be within the ballpark <u>but likely greater to account for five more months of delinquency</u>)

1

- If [petitioner] does not payoff [sic] the loan by that date, [petitioner] consents to a foreclosure sale, and to vacate the property by January 1, 2019;[1]
  - The foreclosure sale is to be used solely to effectuate the settlement agreement and the transfer of title, and [respondent] acknowledges that [petitioner] owes no deficiency;
- No cash payment by [respondent];
- Credit repair within 30 days of acceptance of this offer
  - Within 30 days of acceptance of this offer (not signature of [petitioner]), [respondent] will do credit repair.
- Full release from [petitioner].

On the same date that the offer was conveyed, petitioner's counsel responded by e-mail, "Accepted." In reliance on petitioner's acceptance of the settlement offer, respondent canceled petitioner's deposition scheduled for the following day and filed a "Notice of Settlement" with the circuit court. Respondent also completed the credit repair.

In August of 2019, the parties exchanged draft settlement agreements, and on August 23, 2019, Mr. Nissim-Sabat signed the agreed-upon formalized settlement agreement.[2] In an October 23, 2019, e-mail to respondent's counsel, Mr. Nissim-Sabat confirmed that petitioner was working to pay off the loan by December 1, 2019, but asked whether respondent would be "amenable to [petitioner] renting the property" in the event she needed more time to secure funding. Respondent answered that it was not amenable to such an arrangement.

In December 2019, respondent's authorized representative signed the settlement agreement. Respondent requested that petitioner sign the settlement agreement.

---

[1] This date is a typographical error. Respondent's counsel intended to say—and Mr. Nissim-Sabat understood counsel to mean—January 1, 2020.

[2] The formalized settlement agreement fleshed out some of the terms set forth in the July 25, 2019, e-mail. For instance, with respect to petitioner's obligation to vacate the premises should she fail to pay off her mortgage loan, the agreement further provided that she "shall leave the interior and exterior of the Property in broom-swept condition. . . . [and] shall not remove any fixture from the property." The formalized agreement also specified that, if petitioner's loan was not fully repaid, she would provide respondent with a quitclaim deed and that she "expressly waives any and all rights and defenses she may have to challenge or contest a foreclosure sale of the Property." The agreement also stated that each party would bear their own attorney's fees. With regard to the credit repair, the agreement set forth that petitioner "acknowledges and agrees that the credit reporting agencies are separate entities from [respondent] and that [respondent] cannot guarantee, warrant, or take responsibility for the performance of the credit reporting agencies in changing, deleting, or making entries in relation to any credit information." And, finally, each party acknowledged under the agreement that each "has been represented by counsel of its/their own choice, or has had the opportunity to be represented by counsel and to seek advice in connection with the negotiations for, and in the preparation of, this Agreement."

Petitioner failed to pay off the loan by December 1, 2019, thereby breaching the settlement agreement, but respondent provided petitioner with an extension—until January 17, 2020—to pay off the loan. That date passed too, however, without payment. Petitioner ultimately refused to sign the settlement agreement and vacate the property. Mr. Nissim-Sabat moved to withdraw as counsel, which motion the circuit court granted, and petitioner retained her current counsel.

On February 25, 2020, respondent moved to enforce the parties' settlement agreement. Petitioner opposed the motion, claiming that there was no meeting of the minds. The parties appeared for a hearing on respondent's motion to enforce on July 28, 2020, at which petitioner and Mr. Nissim-Sabat testified.[3]

Petitioner testified that she was aware Mr. Nissim-Sabat had accepted a settlement offer on her behalf on July 25, 2019. Petitioner testified that Mr. Nissim-Sabat shared with her the specific terms of the settlement offer contained within the July 25, 2019, e-mail and that she understood the terms. When asked whether she gave Mr. Nissim-Sabat authority to enter into that settlement agreement, she responded, "Yes, but I was hoping that I would get to see the settlement agreement myself and review it, and I did not." Later, she again confirmed authorizing Mr. Nissim-Sabat to accept the settlement terms, "I think verbally."

Petitioner also identified the material terms of the settlement, including the December 1, 2019, payoff deadline; her obligation to vacate the property should she fail to pay off her loan by that date; that respondent would pay no cash to her or her attorney; and that respondent would submit a credit repair to the credit reporting agencies within thirty days of the settlement offer's acceptance. Petitioner testified that she spoke with Mr. Nissim-Sabat prior to the July 25, 2019, acceptance and discussed "the majority of [the terms]" with him, but she claims she "also expressed the loan modification several times as well." She explained that the loan modification was "what [she] wanted out of the deal"; she "wanted to have [her] loan modified back to where it was before all this started." She was asked, "But if he couldn't get a modification you gave Mr. Nissim-Sabat authority to enter into this delayed time to pay off the loan; isn't that right?" Petitioner said, "Yes, but like I said, I was hoping to see something in writing."

Petitioner acknowledged that she saw the formalized settlement agreement but claimed that it was "[n]ot until after December sometime" that this occurred. She had another attorney "review[] it with me," and petitioner believed that "there were a few" objections to the formalized agreement, but she could not "really remember offhand" what those were. She was not "really sure if there was any difference" between the settlement terms conveyed in the July 25, 2019, e-mail and the formalized settlement agreement.

Mr. Nissim-Sabat confirmed that he discussed the settlement offer with petitioner and that she authorized him to settle on her behalf. He also confirmed that because of the settlement, he and opposing counsel filed a notice of settlement with the court and canceled petitioner's deposition. Mr. Nissim-Sabat testified that he and respondent's counsel worked together to draft the formalized settlement agreement and that no terms of the formalized agreement differed

---

[3] Petitioner waived the attorney/client privilege.

substantially from those set forth in the July 25, 2019, e-mail. He further recounted that he provided petitioner with the formalized agreement in November of 2019 and then again in December of 2019, once it was signed by respondent's representative.[4] But, in addition to their conversations discussing the settlement terms, Mr. Nissim-Sabat sent petitioner a letter on August 14, 2019, containing the terms of the agreement.

Mr. Nissim-Sabat also offered testimony on certain terms of the formalized agreement with which petitioner now takes issue. Concerning the credit repair term, he testified that in his "course of dealings with [respondent's] counsel and [respondent] matters and other matters in which [respondent's counsel] represents loan services, there's an understanding that doing credit repair is what's reflected and that's been drafted in the credit reporting language in the settlement agreement." Mr. Nissim-Sabat acknowledged that respondent "has no power over the credit reporting agencies . . . other than to submit that request." When asked how petitioner would know what that term meant, Mr. Nissim-Sabat said, "I told her." Additionally, petitioner's current counsel represented that he does not "have anything to show this [c]ourt that [the credit repair request] didn't work."

With regard to the paragraph in the formalized agreement providing that

[e]ach of the Parties hereto has been represented by counsel of its/their own choice, or has had the opportunity to be represented by counsel and to seek advice in connection with the negotiations for, and in the preparation of, this Agreement . . . . All Parties who are representing themselves are warned to obtain the advice of an attorney before signing this Agreement,

petitioner's counsel asked Mr. Nissim-Sabat, "[petitioner] never had that opportunity, did she?" Mr. Nissim-Sabat countered that she did have "the opportunity to discuss this settlement agreement and release with me as her counsel."

After hearing petitioner's and Mr. Nissim-Sabat's testimony and the arguments of counsel, the circuit court found

that there were material terms, that there was an offer, there was an acceptance on July 25th that was memorialized in an e-mail that that was, in fact, conveyed to [petitioner] via telephone. It was also conveyed to her later on August 14th in the form of a letter and based upon those terms as stated in the July 25th e-mail . . . that a settlement agreement exists. The terms of which are memorialized there in that e-mail as well as that August 14th letter.

The circuit court memorialized its findings in its July 30, 2020, order granting respondent's motion to enforce the settlement agreement. The court reiterated that the parties reached a settlement on July 25, 2019; that the terms of that agreement were set forth in the July 25, 2019,

---

[4] Mr. Nissim-Sabat testified that "it only took three weeks to draft the settlement agreement," but "it took four months for [respondent] to provide the executed version to me so I could have [petitioner] sign."

4

e-mail between the parties' respective counsel; and that petitioner was aware of and had agreed to those terms. The court also noted the strong presumption that Mr. Nissim-Sabat, as petitioner's counsel of record, possessed the authority to represent her and that petitioner's conduct, including failing to appear for her deposition and trial, demonstrated an intention to be bound by the terms of the settlement agreement. The court also pointed to the fact that respondent sent a letter to effectuate the credit repair, as it agreed to do under the terms of the parties' settlement. Accordingly, the court ordered petitioner to vacate the property, pursuant to the binding terms of the settlement agreement; enjoined petitioner from contesting foreclosure proceedings regarding the property; and enjoined her from committing waste regarding the property and/or removing fixtures. Petitioner now appeals.

"[T]his Court employs an abuse of discretion standard when reviewing a circuit court order enforcing a settlement agreement." *Triad Energy Corp. of W. Va., Inc. v. Renner*, 215 W. Va. 573, 576, 600 S.E.2d 285, 288 (2004).

In petitioner's lone assignment of error, she claims that the circuit court erred in enforcing the settlement agreement because there was no meeting of the minds. She argues that the fact that she did not sign the formalized agreement demonstrates her disapproval of it, and she claims that there is no evidence that she authorized Mr. Nissim-Sabat's e-mail response accepting the settlement terms in light of her testimony that she "hop[ed she] would get to see the settlement agreement [her]self." Petitioner also contends that there are differences between the July 25, 2019, e-mail and the formalized settlement agreement she received in December of 2019, which demonstrates ambiguity regarding mutual assent. For example, she says the e-mail contains no terms or conditions for the foreclosure sale that would occur if she failed to pay off her mortgage loan, no specific payoff amount, and no definition of "credit repair." The formalized settlement agreement, however, includes detailed information for how she was to leave the subject property, sets forth additional terms relative to the foreclosure sale, and provides that respondent will perform a credit repair but excludes any guarantee that a credit repair will occur.

Upon our review of the record, we find that the circuit court did not abuse its discretion in granting respondent's motion to enforce the settlement agreement. Concerning her claim that there is no evidence that she authorized Mr. Nissim-Sabat to accept the settlement on her behalf, we have held that "[w]hen an attorney appears in court representing clients there is a strong presumption of his authority to represent such clients, and the burden is upon the party denying the authority to clearly show the want of authority." Syl. Pt. 5, *Sanson v. Brandywine Homes, Inc.*, 215 W. Va. 307, 599 S.E.2d 730 (2004). Far from "clearly show[ing] the want of" Mr. Nissim-Sabat's authority, petitioner acknowledged *on several occasions* that she authorized him to accept the settlement on her behalf, the terms of which he had explained to her and she was able to recount. Her "hope" to also see a written agreement does not in any way negate this authorization, nor did she condition her settlement on seeing a written agreement.

Petitioner's refusal to sign the formalized settlement agreement likewise does not nullify the parties' settlement. In advancing this argument, petitioner relies on *IMI Norgren, Inc. v. D & D Tooling Manufacturing, Inc.*, 306 F.Supp.2d 796 (2004), but in that case "counsel clearly stated in his e[-]mail that there would be no binding [settlement] agreement until the terms were committed to writing and signed." *Id.* at 803. Because a final settlement was expressly conditioned

5

on execution of a written settlement agreement, the *IMI Norgren* Court found that no settlement agreement was reached. *Id.* at 802. Here, there was no such condition. In fact, the parties demonstrated an intention to be bound upon acceptance rather than execution of a formalized settlement agreement by respondent's agreement to perform the credit repair "[w]ithin 30 days of acceptance of this offer (not signature of [petitioner])." Respondent performed as required in the settlement agreement, and the parties took additional steps to demonstrate their intention to be bound, such as canceling petitioner's deposition and informing the circuit court that a settlement agreement had been reached.

Finally, with respect to petitioner's arguments concerning the claimed differences between the terms contained in the July 25, 2019, e-mail and those set forth in the formalized settlement agreement, respondent highlights that the circuit court did not enforce the formalized settlement agreement; it enforced the agreement made on July 25, 2019, memorialized by the parties' counsels' e-mails and in a subsequent letter from Mr. Nissim-Sabat to petitioner. Therefore, many of petitioner's points are moot. We note, however, that in addition to enforcing the July 25, 2019, agreement, the court ordered that petitioner vacate the premises and enjoined her from contesting foreclosure proceedings and from committing waste and/or removing fixtures. These terms do not materially differ from those set forth in the July 25, 2019, e-mail as, under the terms set forth in that e-mail, petitioner "consent[ed] to a foreclosure sale, and to vacate the property." Consenting to a foreclosure sale necessarily precludes contesting that foreclosure sale, and we further find that enjoining petitioner from committing waste or removing fixtures is not a material alteration of the parties' agreement.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 23, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

6